Samuel CULPEPPER, Plaintiff-Appellant-Cross Appellee,

v.

REYNOLDS METALS COMPANY, Defendant-Appellee-Cross Appellant.

No. 27547.

United States Court of Appeals, Fifth Circuit.

Jan. 8, 1970.

Howard Moore, Jr., Peter E. Rindskopf, Atlanta, Ga., Jack Greenberg, Norman C. Amaker, Robert Belton, Vilma Martinez Singer, New York City, David Copus, E. E. O. C., Washington, D. C., for defendant-appellee-cross-appellant; Albert J. Rosenthal, New York City, of counsel.

Fred R. Edney, Richmond, Va., William M. Pate, Mitchell, Clarke, Pate & Anderson, Atlanta, Ga., for plaintiff-appellant-cross-appellee.

Daniel Steiner, Gen. Counsel, Russel Specter, Asst. Gen. Counsel, David Cashdan, Atty., Washington, D. C., for the Equal Employment Opportunity Commission as amicus curiae.

Before TUTTLE, COLEMAN and SIMPSON, Circuit Judges.

TUTTLE, Circuit Judge.

Appellant, Samuel Culpepper, filed an action on October 24, 1968, in the United States District Court for the Northern District of Georgia, pursuant to 42 U.S.C.A. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq. alleging racial discrimination in the employment practices of appellee, Reynolds Metals Company, and specifically in the denial of a promotion to the position of relief slitter operator.

Samuel Culpepper, a 48-year old Negro, was originally employed at Reynolds' Atlanta Colorweld plant in 1955. The plant is primarily concerned with the cutting, shaping and painting of aluminum siding produced by its Alabama plant and is the final processing before delivery to the customer. Culpepper was initially employed in the receiving department. He later moved into fabri-

cation and is now a decoiler operator in that department, earning $2.62 per hour. This job classification is the highest wage rate within the fabrication department other than a slitter operator which carries a pay rate of fifteen cents per hour more. It is this job for which appellant applied and the denial of which he alleges was based on race.

Reynolds' Atlanta plant is a union plant and has been since 1956. The union agreement gives each employee plant seniority and departmental seniority with each new job opening filled on the principle of qualification and seniority. Each new job or vacancy in an existing job is posted by management for a period of twenty-four hours, and interested employees bid the job by signing the bulletin. Priority for the job opening is based first on departmental seniority and qualifications. Failure of an applicant with departmental seniority to qualify opens the bid to employees in the other departments based on plant seniority and qualifications. The senior bidder is granted a twenty-day trial period to qualify. If he does, he is promoted; if not, the next senior bidder is granted the trial period.

▌ Culpepper unsuccessfully bid the job for the first time in the fall of 1962. The job was awarded to a white employee with less seniority. Culpepper made a grievance complaining of the awarding of the job to the less senior white employee. In April 1963 the job was again posted and Culpepper again bid. He was given a trial period but was found not qualified. (There is some question concerning the conditions and circumstances under which Culpepper was trained and eventually determined not qualified. However, we do not reach this issue, since the case is before us in a preliminary posture.) On March 20, 1967, the job of *relief* slitter operator was posted. Appellant, being the most senior employee, bid again. The job was awarded to a white employee with less seniority on March 28, 1967, because of Culpepper's not having qualified on a different but similar machine in 1963.[1]

Culpepper filed a complaint with the union pursuant to his contractual remedies on April 4, 1967. On May 5, 1967, appellee offered Culpepper a 90-day position as *slitter helper* at *helper* rates ($.25 per hour less than his present earnings) with the opportunity to bid should there be a future opening (a right which he presently had under the union-management contract). On July 15, 1967, Culpepper filed his formal charge with the Equal Employment Opportunity Commission as provided by the Act, 42 U.S.C.A. § 2000e–5(a). A "suit letter," which amounts to a determination by the Commission that probable cause exists, was issued to Culpepper on September 26, 1968, and this action was filed 30 days thereafter.[2]

1. It must be noted here that if appellant can show that racial reasons led to his disqualification in 1963, any consideration of this disqualification after the effective date of Title VII would be prohibited. An employer cannot give present effect to acts which are prohibited by Title VII, although not unlawful when committed. Quarles v. Philip Morris, Inc., 279 F. Supp. 505 (E.D.Va.1968), United States v. Local 189, United Papermakers & Paperworkers, 282 F.Supp. 39 (E.D.La. 1968), aff'd 5 Cir., 1969, 416 F.2d 980, United States v. Hayes International (5 Cir., 1969), 415 F.2d 1038, Local 53 International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler (5 Cir., 1969), 407 F.2d 1047.

2. Normally, a suit letter will not issue until after the Commission has rendered a finding of probable cause and has failed at conciliation efforts. However, as recognized by this court in Miller v. International Paper Co., 408 F.2d 283 (1969), a charging party may request under Commission Regulation 29 C.F.R. § 1601.25 (a) a notice of the right to sue at any time after 60 days has elapsed from the filing of a charge with the Commission. Thus, a charging party may obtain a notice letter prior to the issuance of a Commission determination of probable cause.

Moreover, the Commission's Regulations allow for the issuance of notice letters in cases where a finding of no

The district court held that (1) under Title VII, appellant's claim must be dismissed for failure to file timely charges with the Equal Employment Opportunity Commission (EEOC); (2) that under Title VII, the court does not have the power to grant a preliminary injunction to an individual litigant and (3) that a claim for relief against purely private racial discrimination in employment could not be predicated on 42 U.S.C.A. § 1981. This appeal followed.

 Racial discrimination in employment is one of the most deplorable forms of discrimination known to our society, for it deals not with just an individual's sharing in the "outer benefits" of being an American citizen, but rather the ability to provide decently for one's family in a job or profession for which he qualifies and chooses. Title VII of the 1964 Civil Rights Act provides us with a clear mandate from Congress that no longer will the United States tolerate this form of discrimination. It is, therefore, the duty of the courts to make sure that the Act works, and the intent of Congress is not hampered by a combination of a strict construction of the statute and a battle with semantics.[3]

 This court has held many times that Title VII should receive a liberal construction while at all times bearing in mind that the central theme of Title VII is "private settlement" as an effective end to employment discrimination. In Oatis v. Crown Zellerbach (5 Cir., 1968) 398 F.2d 496, this court held that:

> "It is thus clear that there is *great emphasis in Title VII on private settlement and the elimination of unfair practices without litigation.*"

This view was again voiced in Jenkins v. United Gas Corporation (5 Cir., 1969) 400 F.2d 28, where this court' stated that:

> " * * * EEOC whose function is to effectuate the *Act's policy of voluntary conference, persuasion and conciliation as the principal tools of enforcement.*"

It would, therefore, be an improper reading of the purpose of Title VII if we were to construe the statute as did the district court to permit the short statute of limitations to penalize a common employee, who, at no time resting on his rights, attempts first in good faith to reach a private settlement without litigation in the elimination of what he believes to be an unfair, as well as an unlawful, practice. We, therefore, hold that the statute of limitations, which has been held to be a jurisdictional requirement, is tolled once an employee invokes his contractual grievance remedies in a constructive effort to seek a "private settlement of his complaint."[4] Culpepper also sought to settle his complaint in 1963 through the grievance procedures. We do not think that Congress intended for a result which would require an employee, thoroughly familiar with the rules of the shop, to proceed

---

probable cause is rendered. This flows from the fact that Commission conciliation efforts are not jurisdictional prerequisites to the institution of civil actions under Title VII. Miller v. International Paper Co., *supra*; Dent v. St. Louis-San Francisco Ry. Co., 406 F.2d 399 (1969); Grimm v. Westinghouse, 300 F.Supp. 984 (C.D.Calif., 1969).

3. Honorable Griffin B. Bell, of the Court of Appeals for the Fifth Circuit, in a speech before a lawyers seminar on Title VII stated that:
 "We think that the statute as enacted by Congress is designed to eliminate an unfortunate chapter in our history, when persons have been denied jobs simply by reasons of their race. Therefore, we approach the statute in a generous way. We want to make it work. We want to fill in these gaps, and we want to stay within the intent of Congress in making it work."

4. Based on the facts presented here, there is no need for a determination as to how long the statute is tolled in conjunction with 42 U.S.C.A. § 2000e–5(d). Circumstances will dictate as the cases may present other facts.

solely with his Title VII remedies for fear that he will waive these remedies if he follows the rules of the shop or to do both simultaneously, thereby frustrating the grievance procedure.

In Burnett v. New York Central Railroad Co., 380 U.S. 424, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965), the Court, in holding that the FELA limitations period is not totally inflexible, stated that the basic inquiry is whether congressional purpose is effectuated by tolling the statute of limitations in given circumstances. The Court also held that in order to determine congressional intent, the Court must examine the purposes and policies underlying the limitation provision, the act itself and the remedial scheme developed for the enforcement of the rights given by the Act. See Minnesota Mining v. New Jersey Wood Co., 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1964).

"Statutes of limitations are primarily designed to assure fairness to defendants. Such statutes' promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded * * *.' " Burnett v. New York Central R. R. Co., supra, 380 U.S. at 428, 85 S.Ct. at 1054. Congress, in placing the various time limitations in Title VII, was attempting to eliminate the problem of "second thought complaints," stale complaints and the hampering effect that they can have on our labor market. However, the time limitation is meant to penalize only those who sleep on their rights and remedies, not one who actively attempts to settle his complaint by following the "rules of the shop." Moreover, "the policy behind statutes of limitations is outweighed when the interests of justice require vindication of the plaintiff rights." Burnett v. New York Central R. R., supra, at 428, 85 S.Ct. at 1055. This is the only consistent reading of a "humane and remedial Act." Burnett v. New York Central R. R. Co., supra, at 427, 85 S.Ct. 1050.

In Dewey v. Reynolds Metal Company, D.C., 291 F.Supp. 786, the plaintiff Dewey, a member of the Reformed Church, brought an action under Title VII alleging that he had been discharged because of his religious beliefs. This charge was brought after Dewey had exhausted his contractual remedies including a hearing by an arbitrator and after he had exhausted his state remedies under Michigan law. Dewey's charge was filed with the Michigan State Civil Rights Commission more than nine months and seventeen days after the alleged discriminatory act had occurred— his discharge on September 12, 1966. The specific question before the court was whether Dewey's election to travel the contractual remedies route barred him from his Title VII rights. The court, in answering and by inference treating the statute as if it had been tolled, stated that:

"It is understandable that any union member would first proceed to raise any rights he felt were due him under the contract. Proceeding first therefore through arbitration is in accord with federal labor law. Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Plaintiff should not be penalized for first proceeding with his contractual remedies."

In King v. Georgia Power Co., 295 F. Supp. 943 (N.D.Ga., 1968), as in other cases, it was held that contractual grievance procedures need not be exhausted prior to the filing of a complaint with the Equal Employment Opportunity Commission. The court only said there that Title VII remedies are independent of contractual remedies and therefore there is no prerequisite that an employee exhaust his contractual remedies before he files his charge with EEOC. The position which we take here is not inconsistent with this, for in Georgia Power, the court did not deal with the

question of what happens if the employee invokes his contractual remedies. There is nothing inconsistent with stating that the employee *need only* follow the procedures for relief provided in Title VII and if he follows first his contractual remedies, he is not barred from proceeding under Title VII even if processing his contractual remedies takes more than 90 days.

There is nothing discriminatory about this result, as contended by appellee— that is between those without contractual grievance procedures having to file within 90 days as against those with contractual grievance procedures having to file within 90 days after the grievance procedure has been exhausted, abandoned, or the time for filing the grievance has expired. This is made clear by the inclusion of 42 U.S.C.A. § 2000e–5(b), which manifests the importance of local and private settlements by providing a different timetable for filing a charge with EEOC if there is a state or local fair employment practice committee. In short, some employees have local FEPCs and some do not, thereby receiving a "difference" in treatment under the statute. It is

therefore not unreasonable that a similar difference in treatment is permissible under the statute with respect to employees with established contractual remedies who timely invoke those remedies. Merely because the statute does not specifically provide an allowance for contractual remedies does not mean that allowances are prohibited.[5]

■■■■ The district court held that Culpepper was not entitled to a temporary injunction for under the Act insofar as individual relief is concerned, the powers of the court are explicit,[6] and the explicit remedies available to an individual under 42 U.S.C.A. § 2000e–5(g) are not available until a final determination of the merits of the claim thereby barring temporary relief since it is not specifically mentioned. However, the district court held that preliminary injunctive relief is available in a class-type action under 42 U.S.C.A. § 2000e–5(g), the same statute, with the only difference being the practicality and appropriateness of the relief.[7] Not only is there no basis for distinguishing between the powers granted under this section to an individual and those granted in form of a class, but such a reading

---

5. Appellant argues that this discriminatory act involved here was a non-final act, until Culpepper abandoned the grievance procedure, for as long as the grievance procedure was ongoing, the denial of his claim to the job of relief slitter was not a final act so as to require the filing of an administrative charge under § 706(d). We do not reach that issue based on our disposition of this case on the tolling of the statute feature.

6. 42 U.S.C.A. 2000e–5(g). If the court *finds* that the respondent has intentionally engaged in or is intentionally engaged in an unlawful employment practice charged in the complaint, the court may *enjoin* the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice). Interim earnings or amounts earnable with reasonable diligence by the person or persons dis-

criminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual or a member of a union or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled or was refused employment or advancement or was suspended or discharged for any reasons other than discrimination on account of race, color, religion, sex or national origin or in violation of § 2000e–3(a) of this title. (Emphasis added).

7. In United States Gypsum Co. v. United Steelworkers of America, (5 Cir., 1967) 384 F.2d 38, 45–46, cert. den. 389 U.S. 1042, 88 S.Ct. 783, 19 L.Ed.2d 832 (1968) we held:

"Nationwide activity can grind to a halt over the question of who is to throw a switch. Problems which to the outsider seem petty are thought by the adversaries to be matters of great principle, if not principal."

of 42 U.S.C.A. § 2000e–5(c) is too narrow a reading and not the "generous" interpretation which a humane and remedial statute should receive.

The language in § 2000e–5(g) "if the court finds" does not mean *only* that if the court finds upon a *full hearing* on the merits. It can also mean if the court *finds* upon a hearing on the issue of a temporary injunction, the court may temporarily enjoin the employer and grant temporary affirmative relief.

In Jenkins v. United Gas Corp., (5 Cir., 1968) 400 F.2d 28, where a suit was filed in the form of a class action by a Negro employee who was denied a promotion because of his race, this court said:

"The suit is therefore more than a private claim by the employee seeking the particular job * * * that individual, often obscure, takes on the mantle of sovereign. * * * If he obtains an injunction, he does so not for himself alone but also as a "private attorney general" vindicating a policy that Congress considered of the highest priority."

In Local 53 of International Ass'n Asbestos Workers etc. v. Vogler, (5 Cir., 1969) 407 F.2d 1047, 1052 this court held that in formulating relief from such parties, the courts are not limited to *simply parroting the Act's prohibitions but are permitted, if not required,* to order such affirmative action as may be appropriate.

■ Federal courts have an inherent power to grant appropriate relief. Of course, the Norris-LaGuardia Act (29 U.S.C.A. § 101 et seq.) restricts the injunctive power of the federal courts in the area of labor disputes. Absent such generally expressed prohibition the inherent power remains. There is no expressed prohibition in Title VII. To the contrary, 42 U.S.C.A. § 2000e–5(h) states that the Norris-LaGuardia provision in Sections 101–115 of Title 29 *shall not* apply with respect to civil ac-

tions brought by private persons. It would, therefore, seem that it was the purpose of Congress in enacting § 2000e–5(b) to make it clear that federal courts have power to grant injunctive relief including preliminary injunctions and temporary restraining orders in actions brought by private individuals.

Section 2000e–5(b) (withdrawing this prohibition of the Norris-LaGuardia Act) would be merely superfluous if it meant only that the federal court could issue a permanent injunction, since § 2000e–5(a) immediately preceding it *explicitly* grants this right even under the district court's approach to the statute.

Hicks v. Crown Zellerbach Corp., (E. D.La.1968) 49 F.R.D. 184 is factually similar. There Hicks filed a motion for preliminary injunction and the court held that Hicks was entitled to the preliminary injunction, it appearing that unless immediately restrained, Crown Zellerbach would fill a *single relief slitterman position with a white employee.* See Clark, et al. v. American Marine Corp., 304 F.Supp. 603 (E.D.La., 1969).

If the need exists, we find little distinction in the issuance of a preliminary injunction in a class action under Title VII and in an action by an individual. Such a distinction based on numbers alone is artificial and does not lend itself to the ultimate aim of the statute—full enjoyment of employment rights to all (and each) employees. The mere fact that monetary remuneration is available is not always a substitute for injunctive relief. "The ethic which permeates the American dream [and Title VII] is that *a person* may advance as far as *his talents* and *his merit* would carry *him."* Miller v. International Paper Co., (5 Cir., 1969) 408 F.2d 283, 294. In United States v. Hayes International Corp., et al., 5 Cir., 1969, 415 F.2d 1038, August 19, 1969, we held that where the statutory rights of employees are involved and an injunction is authorized by statute, the usual prerequisite of irreparable injury need not be estab-

lished before obtaining an injunction because irreparable injury should be presumed from the very fact that the statute has been violated.

Appellant also contends that the district court had jurisdiction under 42 U.S.C.A. § 1981. We do not reach that issue here because we hold that the court does have jurisdiction under Title VII.[8]

The judgment is reversed and this case is remanded for further proceedings not inconsistent with this opinion.

COLEMAN, Circuit Judge (concurring).

I agree that the statute of limitations here in issue is tolled "once an employee invokes his contactual grievance remedies in a constructive effort to seek a 'private settlement of his complaint.'" In this connection I would emphasize the presence of the word "constructive". I also agree that the District Court could grant appropriate relief preliminarily. Therefore, as to the merits of this litigation, the opinion is unanimous.

I feel constrained to say, however, that I respectfully disagree with the statement appearing at Page 4 of the opinion that it is "the duty of the courts to make sure the Act works". In the interpretation of statutes the courts are required to give due consideration to the intent of Congress, and not to frustrate that intent. In my view it is never the duty or the concern of the courts "to make sure the Act works". Under our Constitutionally ordained form of government, whether an Act works or fails is the concern of the Executive or of the Legislature, or both—not the courts. I, therefore, agree to the interpretations herein given because I think they are legally correct, not because there is any judicial duty to rescue an Act of Congress from some lack of utility which Congress, if it so desires, has the clear power to correct.

8. See Clark v. American Marine Corp., 304 F.Supp. 603 (E.D.La., 1969).